## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

IOU CENTRAL, INC.　　　　　*
d/b/a IOU FINANCIAL, INC.,　　*
　　　　　　　　　　　　　　*
　　　　Plaintiff,　　　　　　*
　　　　　　　　　　　　　　*
　　v.　　　　　　　　　　　*　　　　1:20-CV-00007-ELR
　　　　　　　　　　　　　　*
CLAUS SCHMITZ, et al.,　　　*
　　　　　　　　　　　　　　*
　　　　Defendants.　　　　　*
　　　　　　　　　　　　　　*

---

**O R D E R**

---

Presently before the Court is Defendants' "Motion to Dismiss the Amended Complaint and, in the Alternative, Motion to Compel Arbitration and to Dismiss the Amended Complaint."  [Doc. 21].  For the reasons below, the Court grants in part and denies in part Defendants' motion.

## I.　　Background[1]

Plaintiff IOU Financial, Inc., filed this case against Defendants Claus Schmitz; Eva Investments, Inc.; Nadia Sandra Bruno; Bodega Bars USA, LLC; and Bruno Investments, LLC, seeking recovery related to overdue payments on an

---

[1] The Court provides the following facts for background purposes only.

unpaid loan.  Am. Compl. ¶ 70 [Doc. 18].  On May 15, 2013, Defendant Claus Schmitz submitted a commercial loan application to Plaintiff through Plaintiff's website.  Id. ¶ 13.  Schmitz sought the loan for his business, Defendant Eva Investments.  Id.  On behalf of Eva Investments, Schmitz executed a Promissory Note to Plaintiff for the principal sum of $70,000, as well as a Personal Guaranty that included a guaranty fee of $7,343. Id. ¶ 16.  The Promissory Note and Personal Guaranty (collectively, "the Loan Instruments") were both executed electronically through Plaintiff's website.  Id.  Schmitz confirmed the information in the loan application and Loan Instruments via a phone call to Plaintiff's office in Georgia. Id. ¶ 15.  Schmitz received the funds from Plaintiff by wire transfer that same day. Id. ¶ 21.  Plaintiff claims Schmitz made "some" payments on the loan but breached the Loan Instruments shortly after the distribution of the funds.  Id. ¶ 23.

Though Eva Investments is the only borrower listed on the Promissory Note [Doc. 21-2 at 2–4] and Schmitz is the only guarantor listed on the Personal Guaranty [Doc. 21-2 at 5–6], Plaintiff also brings this lawsuit against Defendants Nadia Bruno, Bodega Bars, and Bruno Investments.

As set out in Plaintiff's Amended Complaint, in 2006—seven (7) years before the execution of the Loan Instruments—Schmitz managed Defendant Bodega Bars. Am. Compl. ¶ 8.  Schmitz and his then-spouse allegedly "strip[ped] [Bodega Bars] of its assets" and "fraudulently" transferred them to Defendant Eva Investments.  Id.

This resulted in a bankruptcy case that has since been resolved. Id. ¶¶ 3, 8. Plaintiff claims the bankruptcy case and a separate civil case resulted in Eva Investments' ownership of Bodega Bars. Id. ¶ 3.

Defendant Nadia Sandra Bruno was previously Schmitz's employee at Eva Investments and was allegedly in a romantic relationship with Schmitz. Id. ¶¶ 10–11. Plaintiff claims that Nadia Bruno "had an undisclosed, ownership, profit or other beneficial interest" in Eva Investments and Bodega Bars "throughout all times and events relevant to this action." Id. ¶ 12.

Throughout the Amended Complaint, Plaintiff frequently identifies Eva Investments and Bodega Bars as "EVA/BOD," suggesting the two businesses are the same entity. See, e.g., id. ¶¶ 13–16. In recounting the facts related specifically to the execution of the Loan Instruments, Plaintiff claims Schmitz sought the loan for "EVA/BOD" and on behalf of Nadia Bruno, Eva Investments, and Bodega Bars, which Plaintiff repeatedly calls "NSB/EVA/BOD." Id. Plaintiff claims "NSB/EVA/BOD knew, benefitted, consented or later ratified" the Loan Instruments and that these three (3) Defendants were recipients of the funds from the loan. Id. ¶¶ 16–17. Plaintiff also claims Schmitz acted as the agent of "CS/NSB/EVA/BOD"[2] when executing the Loan Instruments. Id. ¶ 24.

---

[2] "CS" is Defendant Schmitz.

Defendant Bruno Investments is a California-based limited liability company, organized in December 2013, whose Statement of Information filed with the California Secretary of State names Defendant Nadia Bruno as its sole manager. [Doc. 21-4 at 2–3].[3] Plaintiff claims that after securing the loan in question, Schmitz "absconded" to California and opened Bruno Investments with Nadia Bruno. Am. Compl. ¶ 59.   In doing so, Schmitz allegedly rendered Eva Investments insolvent and used Eva Investments' "property, assets and proceeds . . . to benefit himself, dishonestly, in bad faith." Id. ¶ 61.  Though Defendant Bruno Investments did not come into existence until after the execution of the Loan Instruments, Plaintiff claims that Bruno Investments, along with "CS/NSB/EVA/BOD," "knew, consented, benefitted and ratified" the Loan Instruments. Id. ¶ 23.  Plaintiff further claims that Schmitz and Nadia Bruno formed Bruno Investments in order to evade repaying the loan. Id. ¶ 26.

Ultimately, Plaintiff claims all five (5) Defendants—Schmitz, Eva Investments, Nadia Bruno, Bodega Bars, and Bruno Investments—are jointly and severally liable for the loan on the basis of one or more of the following conditions: (1) Defendants "operate as and constitute a joint racketing [sic] or other enterprise" and "acted as agents for each other" in obtaining the loan from Plaintiff;

---

[3] Defendants also assert in their Certificate of Interested Persons and Corporate Disclosure Statement that Bruno Investments is "owned 100% by Nadia Sandra Bruno, an individual." [Doc. 11 at 2].

(2) Defendants are a partnership, with Schmitz and Nadia Bruno as the principals, and share profits and control over the businesses; (3) Defendants own and operate Eva Investments "as their alter-ego, disregarding it as a separate entity"; (4) Defendants "lack an existence separate from [Eva Investments] per their unified interest or ownership"; and (5) Defendants assumed joint liability for the debts and other liabilities of Eva Investments. Id.

Plaintiff brings eight (8) counts against all Defendants: (1) Declaratory, equitable and related relief; (2) Breach of instruments and related relief; (3) Breach of fiduciary duty, conversion and related relief; (4) Quantum meruit/unjust enrichment as related relief; (5) Money had and received and related relief; (6) Equitable lien/equitable mortgage and related relief; (7) Constructive trust and related relief; and (8) Attorney's fees and related relief. Id. ¶¶ 38–90.

In response, Defendants filed the instant "Motion to Dismiss the Amended Complaint and, in the Alternative, Motion to Compel Arbitration and to Dismiss the Amended Complaint." [Doc. 21].  Having been fully briefed, this motion is now ripe for the Court's review.

## II.    Rule 12(b)(2) Motion to Dismiss

Defendants bring their motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2). [Doc. 21].  After considering the facts alleged in the Amended Complaint and the evidentiary materials submitted by the Parties, the Court must

determine whether it may fairly exercise personal jurisdiction over Defendants Schmitz, Eva Investments, Nadia Bruno, Bodega Bars, and Bruno Investments. The Court first sets forth the legal standard for this motion then proceeds with two (2) separate jurisdictional analyses: one for Defendants Schmitz and Eva Investments—the Parties to the Loan Instruments—and one for Defendants Nadia Bruno, Bodega Bars, and Bruno Investments. For the following reasons, the Court finds that personal jurisdiction exists over Defendants Schmitz and Eva Investments, but does not exist for Defendants Nadia Bruno, Bodega Bars, and Bruno Investments.

### A. Legal Standard

To determine whether personal jurisdiction exists in a diversity case, a federal court must undertake a two-step inquiry: "the exercise of jurisdiction must (1) be appropriate under the state long-arm statute and (2) not violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution." Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc., 593 F.3d 1249, 1257–58 (11th Cir. 2010) (quoting United Techs. Corp. v. Mazer, 556 F.3d 1260, 1274 (11th Cir. 2009)) (internal quotation marks omitted). Courts must take care not to conflate these two inquiries because Georgia's long-arm statute does not provide jurisdiction that is coextensive with due process. Id. at 1259. The two inquiries are not "one and the

same," and the full extent of Georgia's long-arm statute may be limited by due process concerns. Id. at 1261.

If a district court does not hold an evidentiary hearing on a motion to dismiss for lack of personal jurisdiction, "the plaintiff bears the burden of establishing a prima facie case of jurisdiction over the movant, non-resident defendant." Morris v. SSE, Inc., 843 F.2d 489, 492 (11th Cir. 1988). To satisfy this burden, the plaintiff must present "sufficient evidence to defeat a motion for directed verdict." Id.

First, the court must consider whether the exercise of jurisdiction over Defendants is appropriate under Georgia's long arm statute, O.C.G.A. § 9-10-91. "It is beyond cavil that the exercise of personal jurisdiction in Georgia requires a court to find that at least one prong of the long-arm statute is satisfied." Diamond Crystal, 593 F.3d at 1260. The relevant sections of the Georgia long-arm statute provide:

> A court of this state may exercise personal jurisdiction over any nonresident or his or her executor or administrator, as to a cause of action arising from any of the acts, omissions, ownership, use, or possession enumerated in this Code section, in the same manner as if he or she were a resident of this state, if in person or through an agent, he or she:
> 1. Transacts any business within this state;
> 2. Commits a tortious act or omission within this state, except as to a cause of action for defamation of character arising from the act; [or]
> 3. Commits a tortious injury in this state caused by an act or omission outside this state if the tort-feasor regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state . . . .

O.C.G.A. § 9-10-91(1)-(3).

The "transacts any business" provision in § 9-10-91(1) grants personal jurisdiction over a non-resident defendant if "(1) the nonresident defendant has purposefully done some act or consummated some transaction in [Georgia], (2) if the cause of action arises from or is connected with such act or transaction, and (3) if the exercise of jurisdiction by the courts of this state does not offend traditional fairness and substantial justice." Henriquez v. El Pais Q'Hubocali.com, 500 F. App'x 824, 828 (11th Cir. 2012) (quoting Aero Toy Store, LLC v. Grieves, 279 Ga. App. 515 (2006) (alteration in original)).

Accordingly, in order to determine if Defendants transacted any business in Georgia, the Court must first consider whether Defendants have "done some act or consummated some transaction" in Georgia.  The Eleventh Circuit has indicated that courts should interpret the first prong of Georgia's long-arm statute literally, so that the term "transacts any business" requires the defendant to have "purposefully done some act or consummated some transaction" in the state. Diamond Crystal, 593 F.3d at 1264 (citations omitted).  A defendant does not need to be physically present in the state in order to transact business here, so courts consider "intangible" acts such a telephone calls and emails, as well.  Id.

Georgia courts may also exercise jurisdiction over a nonresident defendant if that individual "commits a tortious act or omission within the state."  O.C.G.A.

§ 9-10-91(2).  Both the Eleventh Circuit and Georgia courts have ruled that torts committed using a telephone or computer occur at the physical place where the defendant speaks into the telephone or uses the computer.  LabMD, Inc. v. Tiversa, Inc., 509 F. App'x 842, 844 (11th Cir. 2013) (finding that tortious conduct occurred where defendants used computers and, because the computers were used outside of Georgia, the defendants were not subject to personal jurisdiction under § 9-10-91(2)).

Finally, in evaluating whether a defendant is subject to personal jurisdiction under § 9-10-91(3), Georgia courts consider factors including "whether (1) a defendant regularly does business or solicits business within Georgia; (2) engages in a persistent course of conduct within Georgia; (3) derives substantial revenue from services rendered within Georgia; (4) has employees located within Georgia; or (5) is authorized to do business in Georgia." Id. at 845.

After determining whether jurisdiction is proper under the long-arm statute, the court must then conduct a jurisdictional analysis under the Due Process Clause. Diamond Crystal, 593 F.3d at 1257–58.  As the Eleventh Circuit noted in Diamond Crystal, "the heart of this [Due Process] protection is fair warning." Id. at 1267.  The defendant's "conduct and connection" with a state must allow him to "reasonably anticipate being haled into court there" and the exercise of jurisdiction "must not

9

offend traditional notions of fair play and substantial justice." Id. at 1267 (internal citations and quotation marks omitted).

**B. Jurisdictional Analysis: Defendants Schmitz and Eva Investments**

Having set out the relevant legal standard, the Court turns to the jurisdictional analysis for Defendants Schmitz and Eva Investments.   First, the Court must consider whether the exercise of jurisdiction over these Defendants is appropriate under Georgia's long-arm statute.

The business transaction in this case is limited to the submission of an online loan application, the online execution of related loan instruments, and a single phone call to Plaintiff's office, all of which took place on the same day.  [Doc. 18-1 ¶¶ 15–18].  Plaintiff does not allege that any Defendants transacted further business in the state, nor that they intended to transact business in Georgia in the future.

Despite having no further contacts with the state of Georgia, Defendant Eva Investments' execution of a promissory note and Defendant Schmitz's execution of a personal guaranty with a Georgia financial institution both constitute the transaction of business within the meaning of Georgia's long-arm statute.   See Georgia R.R. Bank & Trust Co. v. Barton, 315 S.E.2d 17 (Ga. Ct. App. 1984).  In Barton, the Georgia Court of Appeals held that a nonresident debtor who borrowed $125,000 from a Georgia bank purposefully consummated a transaction within the state.  Id. at 20.  Though the nonresident debtor in Barton signed the promissory note

from his residence in South Carolina, the court concluded there was "little doubt that [the nonresident debtor] knowingly and purposefully availed himself of the financial resources of a Georgia banking institution" and therefore consummated a transaction within the state. Id. at 19. By executing loan instruments with a Georgia financial institution, Schmitz and Eva Investments have done the same, even though Schmitz was not physically present in the state at the time of the transaction.

Having satisfied the requirements of Georgia's long-arm statute, the Court turns now to the Due Process Clause analysis. Schmitz and Eva Investments signed binding contracts with a Georgia financial institution, and by doing so, "potentially invoked the protection of the laws of Georgia" concerning liabilities under contract. See id. at 20. The promissory note signed by Schmitz on behalf of Eva Investments not only identifies Plaintiff as a corporation operating in the state of Georgia [Doc. 21-2 at 2 § 2; 4 § 21], but also specifies that: "Borrower hereby expressly consents to Georgia law and forum"; "Borrower acknowledges that the signing of this Note is a culmination of a series of acts carried on in Georgia"; and "Borrower agrees that Georgia is the most convenient location to stand suit." [Doc. 21-2 at 4 § 21]. Similarly, the Personal Guaranty also identifies Plaintiff as a Georgia corporation and specifies that "this Guaranty will be governed by, construed, applied and enforced in accordance with the laws of the State of Georgia." [Doc. 21-2 at 5–6]. By executing the Loan Instruments, Schmitz and Eva

11

Investments could "reasonably anticipate being haled into court" in Georgia, and thus, jurisdiction in Georgia is consistent with the Due Process notions of "fair play" and "substantial justice." See Diamond Crystal, 593 F.3d at 1267.

Accordingly, the Court denies Defendants' 12(b)(2) motion to dismiss for the two signatories to the Loan Instruments, Schmitz and Eva Investments.

### C. Jurisdictional Analysis: Defendants Nadia Bruno, Bodega Bars, and Bruno Investments

Next, the Court turns to the jurisdictional analysis for Defendants Nadia Bruno, Bodega Bars, and Bruno Investments.[4]  Plaintiff ultimately asserts two (2) bases upon which the Court may exercise personal jurisdiction over these Defendants.  First, Plaintiff contends that all Defendants committed torts in Georgia which subjects them to jurisdiction pursuant to § 9-10-91(2) or § 9-10-91(3). [Doc. 23 at 10].   Second, Plaintiff asserts that Defendants Nadia Bruno, Bodega Bars, and Bruno Investments are subject to the Court's jurisdiction on the basis of an agency relationship with Defendant Schmitz.  [Id.] The Court will address each contention in turn.

1.  Jurisdiction as Tortfeasors under Subsections (2) and (3)

First, Plaintiff claims Defendants committed fraud and conspiracy, torts that should subject them to jurisdiction under subsections (2) or (3) of Georgia's

---

[4] A separate jurisdictional analysis is required for these Defendants because they did not sign the Loan Instruments and were not parties to the contract with Plaintiff.

long-arm statute.  Am. Compl. ¶ 42.  These torts were allegedly committed through the online execution of the Loan Instruments.  [Doc. 18-1 ¶¶ 15–18].  Because torts committed using a telephone or computer occur at the physical place where the defendant speaks into the telephone or uses the computer, <u>LabMD</u>, 509 F. App'x at 844, the Court finds the exercise of jurisdiction under § 9-10-91(2) would be improper.

Subsection (3) requires a non-resident tortfeasor to engage in certain minimum contact with Georgia, such as regularly doing or soliciting business or engaging in a "persistent course of conduct" within the state.  <u>Id.</u> at 845.  Other than their alleged involvement with the Loan Instruments, Plaintiff does not contend that Defendants Nadia Bruno, Bodega Bars, and Bruno Investments engaged in contact with Georgia sufficient to subject them to jurisdiction under § 9-10-91(3).  For example, Plaintiff does not claim these Defendants regularly solicited business within Georgia, have employees in Georgia, or were registered to do business in Georgia.  <u>See id.</u>  Accordingly, the Court finds that subsection (3) of Georgia's long-arm statute does not confer jurisdiction over these Defendants.  <u>See ETS Payphone v. TK Indus.</u>, 513 S.E.2d 257 (Ga. Ct. App. 1999) (nonresident defendant who visited Georgia once and negotiated a contract over the telephone and through mail and fax was not subject to personal jurisdiction); <u>Gust v. Flint</u>, 356 S.E.2d 513 (Ga. Ct. App. 1987) (nonresident defendant who advertised in a paper, negotiated a sale

13

over the telephone, and deposited a check from a Georgia resident was not subject to personal jurisdiction).

### 2. Jurisdiction through Agency under Subsection (1)

Plaintiff's only remaining argument regarding jurisdiction over Nadia Bruno, Bodega Bars, and Bruno Investments is that Defendants were agents of each other. Am. Compl. ¶ 36. Georgia's long-arm statute grants jurisdiction over an individual acting through an agent on the same basis that it grants jurisdiction over an individual acting in person. O.C.G.A. § 9-10-91. If Defendants Schmitz or Eva Investments acted as agents for Nadia Bruno, Bodega Bars, or Bruno Investments when they executed the Loan Instruments, then the remaining three (3) defendants may be subject to the Court's jurisdiction under Subsection (1), just as Defendants Schmitz and Eva Investments are.

Georgia law recognizes three (3) ways in which an agency relationship may arise: "expressly, by implication, or through the subsequent ratification by the principal of the agent's conduct." Burgess v. Religious Technology Center, 600 Fed. App'x. 657, 660–61 (11th Cir. 2015); see also O.C.G.A. § 10-6-1. Express agency requires the principal to expressly grant authority for the agent to act on its behalf. Burgess, 600 Fed. App'x. at 661. "Absent express authority, the court may look to whether agency is implied by the circumstances." Id.

14

Plaintiff has offered no evidence that Defendants Schmitz and Eva Investments acted as express agents for Defendants Nadia Bruno, Bodega Bars, or Bruno Investments when executing the Loan Instruments.[5] See Am. Compl. The Court also finds no evidence that an agency relationship was implied by the circumstances of the loan execution.[6] Eva Investments is the only borrower on the promissory note [Doc. 21-2 at 2] and Schmitz—as Eva Investments' sole owner [Doc. 11], officer, and board member—is the only guarantor of the loan. [Doc. 21-2 at 5]. The other Defendants are not mentioned in the Loan Instruments. Nadia Bruno's alleged status as Schmitz's employee and girlfriend does not, on its own, imply an agency relationship. See Owens v. Stifel Nicolaus and Co., Inc., 650 Fed. App'x. 764, 768 (11th Cir. 2016) (illustrating that employment does not automatically establish an agency relationship between employer and employee); Ashburn Health Care Center, Inc. v. Poole, 648 S.E.2d 430, 432–33 (Ga. Ct. App. 2007) (illustrating that marriage does not automatically establish an agency

---

[5] The party alleging an agency relationship carries the burden of proof. Carter v. Kim, 277 S.E.2d 776, 776 (Ga. Ct. App. 1981).

[6] Plaintiff claims that Nadia Bruno and Bodega Bars "ratified the loan," that all Defendants "operate as and constitute a joint enterprise…and/or a partnership, jointly operating for their business," and that Nadia Bruno "had an undisclosed, ownership, profit or other beneficial interest" in Eva Investments and Bodega Bars. Am. Compl. ¶¶ 12, 14, 29. However, Plaintiff has offered neither evidence nor a foundation for these claims aside from the fact that Nadia Bruno was Schmitz's employee and that Schmitz and Nadia Bruno were allegedly in a romantic relationship with each other. Id. ¶¶ 10–11. Furthermore, the claims that Defendants were a joint enterprise or had ownership in each other's businesses is refuted by Defendants' affidavit [Doc. 11], the registration report for Eva Investments [Doc. 21-3 at 2], and the statement of information for Bruno Investments. [Doc. 21-4 at 3].

relationship between spouses). Nor does Plaintiff offer any evidence that Schmitz was acting as an agent for Bodega Bars while executing a loan for a different business. See Shivers v. Barton & Ludwig, 296 S.E.2d 749, 750 (Ga. Ct. App. 1982) ("Where the only evidence that a person is an agent of another party is the mere assumption that such an agency existed, or an inference drawn from the actions of that person that he was an agent of another party, such evidence has no probative value and is insufficient to authorize a finding that such agency exists."). Finally, Bruno Investments could not have been the principal during a loan execution that took place seven (7) months before it came into existence as a business. [Doc. 21-4 at 2–3].

Defendants Nadia Bruno, Bodega Bars, and Bruno Investments had no independent contact with the state of Georgia sufficient to subject them to the jurisdiction of Georgia courts, and there is no evidence that Schmitz and Eva Investments acted as their agents when executing the Loan Instruments. The Court therefore grants these Defendants' motion to dismiss and dismisses all claims against Defendants Nadia Bruno, Bodega Bars, and Bruno Investments[7] for lack of personal jurisdiction.

---

[7] Plaintiff also names ELA, Elevated Lifestyle Appliances as a Defendant. Am. Compl. Elevated Lifestyle Appliances is an alias of Bruno Investments and is therefore also dismissed for lack of personal jurisdiction.

### III.   Motion to Compel Arbitration

The Court now turns to Defendants' motion to compel arbitration.  [Doc. 21].
Defendants request that the Court compel arbitration based on an arbitration clause
contained within the loan instruments.  [Id. at 13].  The Court sets out the relevant
legal standard pursuant to the Federal Arbitration Act, 9 U.S.C. § 2, before
addressing Defendants' arguments.

#### A. Legal Standard

Pursuant to the Federal Arbitration Act ("FAA"), arbitration clauses "shall be
valid, irrevocable, and enforceable, save upon such grounds as exist at law or in
equity for the revocation of any contract."  9 U.S.C. § 2.  The FAA provides that a
party may challenge another party's failure to comply with an arbitration agreement
by "petition[ing] any United States district court which, save for such agreement,
would have jurisdiction . . . for an order directing that such arbitration proceed in the
manner provided for in such agreement."  9 U.S.C. § 4.  "The court shall hear the
parties, and upon being satisfied that the making of the agreement for arbitration or
the failure to comply therewith is not in issue, the court shall make an order directing
the parties to proceed to arbitration in accordance with the terms of the agreement."
Id.

"Where [a] contract contains an arbitration clause, there is a presumption of
arbitrability" such that a court should order the parties to arbitrate unless it can be

said with certainty that the arbitration clause does not cover the asserted dispute. AT&T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 650 (1986).  In deciding upon a motion to compel arbitration, a district court must consider: "1) whether a valid written agreement to arbitrate exists, 2) whether an arbitrable issue exists, and 3) whether the right to arbitrate was waived."  Mercury Telco Group, Inc. v. Empresa De Telecommunicaciones De Bogota S.A. E.S.P., 670 F. Supp. 2d 1350, 1354 (S.D. Fla. 2009).  Neither party in this case disputes the existence of a valid written agreement to arbitrate or that an arbitrable issue exists. The sole question is whether Defendants have waived their right to arbitrate.

Courts assess whether a party has waived its right to arbitrate using a two-part test which requires the establishment of both parts.  In re Checking Account Overdraft Litig. v. Keybank Nat'l Ass'n, 754 F.3d 1290, 1294 (11th Cir. 2014). First, "the party seeking arbitration substantially participates in litigation to a point inconsistent with an intent to arbitrate," and second, "this participation results in prejudice to the opposing party."  Id.  There is no specific rule as to what constitutes a waiver of the right to arbitrate.  Burton-Dixie Corp. v. Timothy McCarthy Constr. Co., 436 F.2d 405, 408 (5th Cir. 1971).[8]  Instead, whether waiver has occurred "depends upon the facts of each case."  Id. Notably, the party arguing waiver "bears

---

[8] Decisions by the former Fifth Circuit issued before October 1, 1981, are binding as precedent in the Eleventh Circuit.  See Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

a heavy burden of proof." Stone v. E.F. Hutton & Co., 898 F.2d 1542, 1543 (11th Cir. 1990).

### B. Analysis

In its assessment of waiver, the Court first determines whether Defendants acted inconsistently with the arbitration right. S & H Contractors, Inc. v. A.J. Taft Coal Co., Inc., 906 F.2d 1507, 1514 (11th Cir. 1990). Plaintiff claims that Defendants engaged in "manipulative gamesmanship" by filing their motion to dismiss "but then seeking arbitration in Georgia," therefore waiving their right to litigation. [Doc. 23 at 17].

While the Eleventh Circuit has recognized that a party who "invokes the litigation machinery prior to demanding arbitration may waive its right to arbitrate," it remains true that such invocation must be "substantial." S & H Contractors, 906 F.2d at 1514 (alterations and internal quotation marks omitted). Here, Defendants clearly expressed their intent to arbitrate in their first motion to dismiss [Doc. 10], second motion to dismiss [Doc. 21], Response [Doc. 22], and Reply [Doc. 25]. Defendants' filing of procedurally required documents and their compliance with this Court's rules and the federal rules of disclosure constitute neither substantial participation in litigation nor an inconsistent intent to arbitrate. Compare Garcia v. Wachovia Corp., 699 F.3d 1273, 1278 (11th Cir. 2012) (waiver of arbitration found where party conducted discovery for over a year, including more than 15 depositions

and production of approximately 900,000 pages of documents).  Accordingly, the Court finds that Defendants did not substantially participate in litigation to a point inconsistent with their intent to arbitrate.

In determining whether Plaintiff suffered prejudice as a result of any delay by Defendants in filing this motion, the Court "may consider the length of delay in demanding arbitration and the expense incurred by the party from participating in the litigation process."  S & H Contractors, 906 F.2d at 1514.  Defendants' first motion to dismiss was filed twenty-five (25) days after Plaintiff filed its original Complaint, and Defendants' second motion to dismiss was filed only ten (10) days after Plaintiff filed its Amended Complaint.  These short time periods do not suggest a waiver of Defendants' intent to arbitrate.  See id. (plaintiff waived its right to arbitrate because waiting "eight months from the time it filed its complaint to the time it demanded arbitration" was inconsistent with an intent to arbitrate); see also Morewitz v. West of England Ship Owners Mut. Protection and Indem. Assn'n (Luxembourg), 62 F.3d 1356. 1366 (11th Cir. 1995) (moving to compel arbitration after five years of litigation is inconsistent with intent to arbitrate).

Plaintiff chose to file suit in court rather than arbitrate their claims and therefore cannot assert prejudice from being required to file certain procedural documents. While these filings may have taken the time of Plaintiff's attorney, the amount of resources expended does not rise to the level of prejudice.  See S & H

Contractors, 906 F.2d at 1514 (nonmoving party prejudiced by expenditure of resources by engaging in substantial litigation when filing a motion to dismiss, a motion in opposition for discovery, and taking five depositions while party moving to compel arbitration waited eight months to do so).

Accordingly, the Court finds that Defendants did not waive their right to arbitrate. The Court therefore grants Defendants' motion to compel arbitration. [Doc. 21]. The Court directs Defendants Schmitz and Eva Investments to initiate any arbitration proceedings within sixty (60) days from the date of entry of this order. Rather than stay this case pending the outcome of the Parties' arbitration proceedings, the Court will administratively close this case. If Defendants do not initiate arbitration within sixty (60) days from the date of entry of this order, Plaintiff may move to reopen the case.

## IV.   Conclusion

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' "Motion to Dismiss the Amended Complaint and, in the Alternative, Motion to Compel Arbitration and to Dismiss the Amended Complaint." [Doc. 21]. Specifically, the Court denies the motion to dismiss under Rule 12(b)(2) for Defendants Schmitz and Eva Investments. However, the Court grants the motion to dismiss under Rule 12(b)(2) for Defendants Nadia Sandra Bruno; Bodega Bars; and Bruno Investments d/b/a ELA, Elevated Lifestyle Appliances and dismisses all

claims against these Defendants.  The Court also grants Defendants' motion to compel arbitration for Defendants Schmitz and Eva Investments.  The Court **DIRECTS** the Clerk to **ADMINISTRATIVELY CLOSE** this case while the Parties are engaged in arbitration proceedings.  Should the Parties resolve this case at arbitration, the Court **DIRECTS** the Parties to file on the docket a stipulation of dismissal within thirty (30) days from the close of arbitration proceedings.

**SO ORDERED**, this _____ day of June, 2020.

Eleanor L. Ross
United States District Judge
Northern District of Georgia